# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-1118V

---

LISA A. WHITEHEAD,

               Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

               Respondent.

Chief Special Master Corcoran

Filed: September 14, 2023

---

*Richard H. Moeller, Moore, Heffernan, et al., Sioux City, IA, for Petitioner.*

*Joseph Adam Lewis, U.S. Department of Justice, Washington, DC, for Respondent.*


### DECISION AWARDING DAMAGES[1]

      On September 2, 2020, Lisa A. Whitehead filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table injury or, in the alternative caused-in-fact injury, after receiving an influenza ("flu") vaccine on October 3, 2019. Petition at 1-2, ¶¶ 3-4, 34-35. Respondent conceded entitlement, but the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] After more than one year of damages discussions, the parties informed me that they had reached an agreement regarding the appropriate amount of Petitioner's out-of-pocket expenses, but had reached an

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount **$205,951.00**, **representing $199,000.00 for actual pain and suffering, plus $6,951.00 for actual/unreimbursed expenses**.

## I.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my

---

impasse regarding the appropriate amount of compensation for pain and suffering. Status Report, filed Dec. 21, 2022, ECF No. 52.

predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.    Prior SIRVA Compensation Within SPU[5]

### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2023, 3,304 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 3,211 of these cases, with the remaining 93 cases dismissed.

Of the compensated cases, 1,834 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 173 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[6]

1,632 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 29 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 1,377 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

| | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[7] Agreement |
|---|---|---|---|---|
| **Total Cases** | *173* | *1,632* | *29* | *1,273* |
| **Lowest** | $40,757.91 | $22,500.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,200.00 | $62,825.18 | $90,000.00 | $38,134.81 |
| **Median** | **$92,299.83** | **$83,039.25** | **$130,000.00** | **$55,000.00** |
| **3rd Quartile** | $125,000.00 | $111,475.61 | $150,000.00 | $80,803.17 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

---

[6] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

### B.    Pain and Suffering Awards in Reasoned Decisions

In the 173 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $215,000.00, with $90,000.00 as the median amount. Only seven of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In six cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### III.    The Parties' Arguments

The parties agree Petitioner should be awarded $6,951.00 for past unreimbursed expenses. Petitioner's Damages Brief ("Brief") at 1 n.1, 17, filed Feb. 8, 2023, ECF No. 56. Thus, the only area of disagreement is the amount of compensation which should be

---

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

awarded for Petitioner's past/actual pain and suffering. Petitioner seeks $210,000.00 for her pain and suffering, and Respondent proposes the lower amount of $150,000.00. Brief at 1, 18; Respondent's Brief Regarding Damages ("Opp.") at 10.

When arguing for this pain and suffering amount, Petitioner emphasizes the almost three-year duration of her SIRVA injury and extensive treatment received during that time - including two surgeries, four steroid injections, two MRIs, pain medication, and PT. Brief at 15. She also argues that her suffering was augmented by her personal circumstances - job stress related to a change in management, sadness due to her granddaughter's cancer diagnosis in October 2020, issues created by the COVID Pandemic, and difficulties caring for her adult disabled child who suffered a fall and fractured three cervical vertebrae in November 2020. *Id.* at 2, 7-10, 15-16. She favorably compares the facts and circumstances in her case with those suffered by the petitioners in *Lavigne, Meirndorf, McDorman, M.W.,* and *Schoonover*[9] - decisions featuring past pain and suffering awards ranging from $195,000.00 to $200,000.00. Brief at 16-17.

In contrast, Respondent emphasizes an almost one-year gap in treatment from June 9, 2020, through May 17, 2021; significant improvement following a second surgery on February 23, 2022; and almost complete resolution of Petitioner's injury by July 5, 2022, less than three years post-vaccination. Opp. at 8-9. Respondent proposes *Rice-Hansen* and *M.W.*,[10] involving awards of $175,000.00 and $195,000,00, respectively, as comparable cases, insisting Petitioner's SIRVA injury was milder and required less treatment. Opp. at 8-9.

In her reply brief, Petitioner criticizes Respondent's failure to mention the specific circumstances involved in her case, and what she deems to be a mischaracterization of her gap in treatment. Petitioner's Responsive Damages Brief ("Reply"), at 1-6, filed Feb. 23, 2023, ECF No. 57. Drawing a distinction between a failure to seek treatment that is indicative of a resolution or reduction in symptoms versus the gap in her case (which occurred between two surgeries and during the COVID Pandemic), Petitioner maintains the record overall establishes continued pain (rated as five out of ten) during this time. *Id.*

---

[9] *Lavigne v. Sec'y of Health & Hum. Servs.,* No. 19-1298V, 2022 WL 2275853 (Fed. Cl. Spec. Mstr. May 12, 2022) (awarding $198,000.00 for past pain and suffering); *Meirndorf v. Sec'y of Health & Hum. Servs.,* No. 19-1876V, 2022 WL 1055475 (Fed. Cl. Spec. Mstr. Mar. 7, 2022) (awarding $200,000.00 for past pain and suffering); *McDorman v. Sec'y of Health & Hum. Servs.,* No. 19-0814V, 2021 WL 5504698 (Fed. Cl. Spec. Mstr. Oct. 18, 2021) (awarding $200,000.00 for past pain and suffering); *M.W. v. Sec'y of Health & Hum. Servs,* No. 18-0267V, 2021 WL 3618177 (Fed. Cl. Spec. Mstr. Mar. 17, 2021); *Schoonover v. Sec'y of Health & Hum. Servs.,* No. 16-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020) (awarding $200,000.00 for past pain and suffering).

[10] *Rice-Hansen v. Sec'y of Health & Hum. Servs.,* No. 20-1338V, 2022 WL 18339478 (Fed. Cl. Spec. Mstr. Dec. 9, 2022); *M.W.*, 2021 WL 3618177.

at 5-6.

Additionally, Petitioner disputes Respondent's contention that her pain and suffering was lower than that experienced by the petitioners in *Rice-Hansen* and *M.W.* Reply at 7-10. She contrasts the surgery and subsequent manipulation under anesthesia in *Rice-Hansen* with the two surgeries she underwent, emphasizing my description of the manipulation as generally "less invasive than surgery." *Id.* at 8 (citing *Rice-Hansen,* 2022 WL 18339478, at *10). Noting that I declined to award an amount for future pain and suffering in *M.W.,* Petitioner argues that the *M.W.* petitioner's continued treatment and additional MRI are not sufficient to support the substantially lower figure proposed by Respondent. Reply at 9-10.

### IV.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical record reveals that Ms. Whitehead suffered a moderate to severe SIRVA injury for approximately 33 months.[11] She was administered four steroid injections, underwent two surgeries, and attended a total 19 PT sessions in three separate groupings – after her first surgery, several months before her second surgery, and after her second surgery. She did not see significant improvement in her symptoms until May 2022, after her second surgery and subsequent PT. Exhibit 23 at 13; *see* Exhibit 10-34 (PT records). By July 5, 2022, she showed a good resolution of her symptoms. Exhibit 24 at 10 (reporting only minor pain with extreme movement and the ability to lay on her left side and sleep well); *see also* Exhibit 27 at ¶ 28 (second affidavit).

Although Petitioner failed to seek treatment from June 9, 2020, through May 17,

---

[11] From vaccination until her second surgery, almost 29 months later, on February 22, 2022, Petitioner consistently reported pain levels ranging from five to ten on a scale of ten. *E.g.,* Exhibit 8 at 60, 55, 47; Exhibit 15 at 12, 8; Exhibit 16 at 14, 8; Exhibit 22 at 10 (all cites in chronological order by treatment date). For a two-month period during the first half of 2020, her pain levels were three out of ten. Exhibit 8 at 32; Exhibit 15 at 21 (all cites in chronological order by treatment date).

2021, the record shows she continued to experience symptoms during this time.[12] And the COVID Pandemic does explain some of the treatment lapse. Additionally, Petitioner was forced to cease the PT she attended following her first surgery, when she required gall bladder surgery in early May 2020. Exhibit 8 at 15-16.

Petitioner's case was further complicated by other personal circumstances occurring simultaneously with her SIRVA injury. Petitioner has substantiated that she faced work-related difficulties at this time that were exacerbated by her medical concerns. Exhibit 27 at ¶¶ 6, 16-17, 27. Additionally, her thirty-three-year-old son, who suffered hydrocephalus[13] at birth, required significant help with daily tasks and suffered a seizure and a fall down the cellar steps, resulting in fractures in three spinal vertebrae, during November 2020. Exhibit 27 at ¶¶ 5, 12, 22-23. Around this same time, Petitioner's six-year-old granddaughter was diagnosed with embryonal rhabdomyosarcoma,[14] a rare form of childhood cancer. Exhibit 27 at ¶¶ 21, 27.

The cases proposed by Petitioner offer the most appropriate comparisons. All involved prompt initial treatment, two surgeries, multiple cortisone injection (except for *M.W.*), a similar amount of PT, and an overall injury duration of approximately three years (between two and four years).[15] The closest examples are provided by *Lavigne, McDorman,* and *Meirndorf* – with Petitioner's duration and pain levels slightly above those in *Lavigne* but slightly below those in *McDorman* and *Meirndorf*. *Lavigne*, 2022 WL 2275853, at *1-3; *McDorman*, 2021 WL 5504698, at *2-4; *Meirndorf*, 2022 WL 1055475, at *2-3. Additionally, the *McDorman* and *Meirndorf* petitioners suffered similarly complicating factors of a special needs son and depression due to chronic pain, respectively. *McDorman*, 2021 WL 5504698, at *4; *Meirndorf*, 2022 WL 1055475, at *3

. Given the pain and suffering awards of $198,000.00 in *Lavigne* and $200,000.00 in *McDorman* and *Meirndorf*, I find $199,000.00 to be an appropriate amount for Petitioner's past pain and suffering.

---

[12] Prior to this gap in treatment, Petitioner continued to report symptoms of her SIRVA injury and a pain level of three out of ten. Exhibit 15 at 23. When she returned for treatment in May 2021, Petitioner reported continued daily pain, increasing with daily activities, at a level of five out of ten. *Id.* at 14.

[13] Hydrocephalus is "a condition marked by dilation of the cerebral ventricles, most often occurring secondary to obstruction of the cerebrospinal fluid pathways . . . and accompanied by an accumulation of cerebrospinal fluid within the skull." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 877 (32th ed. 2012).

[14] Rhabdomyosarcoma is "a highly malignant tumor of striated muscle derived from primitive mesenchymal cells and exhibiting differential along rhabdomyoblastic lines, including but not limited to the presence of cells with recognizable cross striations." DORLAND'S at 1637. Embryonal rhabdomyosarcoma is "the most common for of rhabdomyosarcoma." DORLAND'S at 1638.

[15] *Lavigne*, 2022 WL 2275853, at *1-3; *Meirndorf*, 2022 WL 1055475, at *2-3; *M.W.*, 2021 WL 3618177, at *1-2; *McDorman*, 2021 WL 5504698, at *2-4; *Schoonover*, 2020 WL 5351341, at *4-5.

**Conclusion**

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $199,00.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering.[16] I also find that Petitioner is entitled to $6,951.00 in past expenses.**

Based on the record as a whole and arguments of the parties, **I award a lump sum payment of $205,951.00, representing $199,000.00 for her actual pain and suffering and $6,591.00 for her actual unreimbursable expenses, in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[17]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[16] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.